**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGELICA PAOLA TRILLERAS GOMEZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>Defendants. | Case No. 26-cv-2364 (JMC) |

# MEMORANDUM OPINION

Angelica Paola Trilleras Gomez, a J-1 visa holder from Colombia, and her spouse Jonathan Alan Liao, an American citizen, sued several governmental Defendants.[1] *See* ECF 3 ¶¶ 1, 3, 67–68. They allege that when Trilleras petitioned the U.S. Citizenship and Immigration Services (USCIS) to waive a requirement of her J-1 visa, the USCIS denied her petition on the grounds that she had—about two years earlier—already received a waiver of that same requirement (although Trilleras allegedly never used that waiver). *See id.* ¶¶ 1, 4–7. Based on that denial, Plaintiffs concluded that the USCIS and the State Department—which itself also administers J-1 visas—are using a "one waiver per customer" rule. *Id.* ¶¶ 3, 8. Plaintiffs say that the agencies' use of this rule violates the Administrative Procedure Act (APA) because the rule is in effect a "secret law," promulgated without notice and comment. *Id.* ¶¶ 13, 131–39. Plaintiffs also allege that the "one waiver per customer rule" is arbitrary and capricious, *ultra vires*, and contrary to law in violation of the APA.

[1] These Defendants are Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security; Joseph B. Edlow, in his official capacity as Director of the U.S. Citizenship and Immigration Services (USCIS); Carrie M. Selby, in her official capacity as Acting Associate Director of Service Center Operations for the USCIS; Marco A. Rubio, in his official capacity as Secretary of State; Jennifer L. Weronski, in her official capacity as the Chief of the Waiver Review Division of the State Department; the USCIS; and the State Department. *See* ECF 3 ¶¶ 28, 33–39.

*Id.* ¶¶ 102–30. In addition to these APA claims, Plaintiffs also sue under the Freedom of Information Act (FOIA), seeking an order compelling Defendants to produce agency records related to this "secret law." *Id.* ¶¶ 140–47.

Presently, the Court is faced with Plaintiffs' motion for a preliminary injunction. ECF 8. Plaintiffs seek to enjoin a new Department of Homeland Security (DHS) rule from applying to Trilleras for the duration of this litigation. *Id.* ¶ 1. This new rule does not pertain to the process of visa waiver applications at all. Rather, the rule would cause Trilleras to begin accruing days of "unlawful presence" in the United States as early as September 15, 2026, when she otherwise would not begin accruing unlawful presence until some indeterminate later time. *Id.* ¶¶ 3–4. Plaintiffs argue that unless the Court prevents this rule from applying to Trilleras, Trilleras could be deported, detained, or otherwise banned from re-entering the United States during the course of this litigation. *Id.* ¶ 4.

The Court has reviewed the papers. No hearing is necessary. While the Court is sympathetic to Trilleras' predicament, Plaintiffs have not shown that the legal basis for issuing a preliminary injunction has been satisfied. The Court will therefore **DENY** Plaintiffs' motion.[2]

## I. BACKGROUND

### A. Legal Background

To understand this dispute, some general knowledge of J-1 visas is required. The Court briefly summarizes the framework governing those visas here.

When a foreign national seeks to enter the United States, they generally must first obtain a visa from the State Department. *Gomez v. Trump*, 485 F. Supp. 3d 145, 158 (D.D.C. 2020). "There

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

are two overarching categories of visas: immigrant and nonimmigrant." *Id.* "Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment, and certain types of temporary work." *Id.* "Immigrant visas are issued to foreign nationals intending to relocate permanently to the United States." *Id.*

The J-1 visa is a nonimmigrant visa. *See Khan v. Blome*, No. 22-cv-2422, 2022 WL 17262219, at *1 (D.D.C. Nov. 29, 2022). It permits certain foreign nationals to come to the United States for a limited term "for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training." 8 U.S.C. § 1101(a)(15)(J). Once the visa expires—often when the prescribed term of study, research, or teaching ends, *see* 8 C.F.R. § 214.2(j)(1)(ii)—the visa holder generally must return to their home country for a period of at least two years. *See* 8 U.S.C. § 1182(e).

That return requirement, however, can be waived in certain instances. 8 U.S.C. § 1182(e). Relevant in this case are two particular types of waivers. The first is what the Court terms a "clinical waiver."[3] That waiver allows the J-1 visa holder to stay in the United States past the end of their program so long as they "agree[] to practice primary care or specialty medicine . . . for a total of not less than 3 years" in certain "geographic area[s]" that have a "shortage of health care professionals." 8 U.S.C. § 1184(*l*)(1)(D). The second is an "exceptional hardship waiver." That waiver allows the J-1 visa holder to stay in the United States if certain agency officials determine that requiring the visa holder to return home "would impose exceptional hardship upon" the visa holder's "spouse or child." *Id.* § 1182(e). If a J-1 visa holder is approved for either of these waivers, they can seek H-1B sponsorship and consequently remain in the United States on an immigrant, rather than nonimmigrant, visa. *See id.* § 1101(a)(15)(H)(i)(b).

[3] These clinical waivers are sometimes also referred to as "Conrad 30 Waivers." *See, e.g.*, *Michailidou v. E. Me. Med. Ctr.*, No. 23-cv-352, 2025 WL 2821371, at *3 (D. Me. Oct. 3, 2025); *see also* 8 C.F.R. § 212.7(c)(9).

However, if a J-1 visa holder overstays their visa *without* obtaining a waiver and subsequent H-1B status, they risk being subjected to a number of different enforcement mechanisms. One such mechanism is deportation. The Immigration and Nationality Act (INA) says that any individual "who was admitted [to the United States] as a nonimmigrant"—which includes J-1 visa holders—is "deportable" if they "fail[] to maintain the nonimmigrant status" under which they were admitted. 8 U.S.C. § 1227(a)(1)(C)(i); *see also Khan*, 2022 WL 17262219, at *1. Failure to maintain a J-1 visa, then (e.g., by overstaying the term of the visa), renders a nonimmigrant potentially subject to deportation proceedings.

Another enforcement mechanism is the accrual of unlawful presence. Under the INA, an individual who is "unlawfully present in the United States" for "more than 180 days but less than 1 year" is barred from returning to the United States for three years after their departure or removal. 8 U.S.C. § 1182(a)(9)(B)(i)(I). Likewise, an individual who is "unlawfully present in the United States for one year or more" is barred from returning to the United States for *ten* years after their departure or removal. *Id.* § 1182(a)(9)(B)(i)(II). Thus, a former J-1 visa holder who enters a state of unlawful presence risks not only deportation, but also—depending on the duration of their unlawful presence—the possibility that they may not be able to re-enter the United States for many years.

Importantly, being "deportable" is different from "accruing unlawful presence," at least when it comes to J-1 visa holders. The INA makes clear that failure to maintain J-1 visa status renders an individual immediately and automatically "deportable." 8 U.S.C. § 1227(a)(1)(C)(i). However, even if a J-1 visa holder overstays the term of their program (and thus becomes deportable), current regulations hold that the "unlawful presence" clock does not start ticking until "the day after the immigration agency finds a status violation while adjudicating a request for an

immigration benefit or the day after an immigration judge finds the individual removable." 5 Gordon et al., Immigration Law and Procedure § 63.10(2)(b). Thus, while a person who overstays their J-1 visa can, at any point, be subjected to deportation proceedings, that same person does not accrue "unlawful presence" until after those proceedings have been resolved against them, or until an agency formally finds that they have violated their visa terms. Under this framework, if a J-1 visa holder who has overstayed their program leaves the United States fewer than 180 days after the unlawful presence clock starts, they can seek readmission at any point. Not so for an overstayed J-1 visa holder who leaves after 180 days or more of unlawful presence and consequently faces a multi-year statutory penalty.

As relevant for this motion, though, the "current regulations" will not be the governing rules for much longer. On July 17, 2026, DHS published a new final rule that will take effect on September 15, 2026. *See* Establishing a Fixed Time Period of Admission, 91 Fed. Reg. 44,976, 44,976 (July 17, 2026) ("September Rule"). The September Rule will cause J-1 visa holders to now begin accruing unlawful presence at a date certain: four years and thirty days after admission is granted (unless the visa holder's exchange program ends sooner). *See id.* at 45129. If a J-1 visa holder is already out of status by the time the September Rule takes effect (meaning, their exchange program has finished, and they have overstayed their visa), the unlawful presence clock will start ticking that same day. *See id.* at 45019.

**B. Factual Background**

The Court summarizes the alleged facts as they appear in Plaintiffs' amended complaint. ECF 3. While not all of these alleged facts are supported by record evidence, the Court notes that its decisions of law would be the same even if all of Plaintiffs' complaint was taken as true.

Plaintiff Trilleras is a Colombian national. ECF 3 ¶ 67. She came to the United States in 2019 to practice and study medicine. *Id.* ¶ 68. She was admitted on a J-1 visa. *Id.*

Trilleras' visa program was slated to end in 2024. ECF 3 ¶ 71. But when the time came, rather than return to Colombia for two years, Trilleras sought a clinical waiver to remain in the United States. *Id.* Trilleras was at this point a seasoned doctor. *See id.* ¶¶ 68–70. Perhaps in recognition of that fact, the USCIS granted her waiver application. *Id.* ¶ 71. The agency determined that she could remain stateside on a path to immigrant status (as opposed to the J-1 nonimmigrant status she previously had), so long as she fulfilled the requirements of the waiver by practicing medicine in an underserved area for three years. *Id.* ¶¶ 71, 73. That worked out fine for Trilleras, since she already had a qualifying job offer to practice medicine in southeastern California. *Id.* ¶ 74.

But then, after receiving some dubious legal advice, Trilleras suddenly canceled her employment contract and made the decision to forgo her clinical waiver entirely, only one month after it had been approved. ECF 3 ¶¶ 5, 71, 74, 76–77. In doing so, she consciously forfeited her opportunity to have a legitimate pathway to immigrant status. *See id.* ¶ 74. This seemingly did not concern Trilleras, though, because she believed she had an equally legitimate way to stay in the United States: She could obtain an exceptional hardship waiver. *Id.* ¶ 76. Trilleras had at least some grounds for thinking that this type of waiver would be obtainable—she had recently married Plaintiff Liao, an American citizen, and there were arguments that Liao would experience medical, economic, and social difficulties if Trilleras were required to return to Colombia for two years. *Id.* ¶¶ 32, 80. Trilleras put these arguments in a formal waiver application to the USCIS and let the days pass as that application processed. *See id.* ¶¶ 78, 80. Unbeknownst to her—again, allegedly

because of lacking legal advice—she had now officially overstayed her visa and was at risk of being deported. *See id.* ¶ 77.

After some back and forth with the USCIS, ECF 3 ¶¶ 82, 89, the agency denied Trilleras' request for an exceptional hardship waiver on March 26, 2026, *id.* ¶ 90. The denial stated in part that Trilleras' application could not proceed because she had not shown that her "previously approved waiver"—i.e., the short-lived clinical waiver—had been appropriately "canceled." *Id.* ¶ 90. That ruling caused Trilleras some chagrin; indeed, in her application to the USCIS, she had included a signed declaration stating that she had no intention of relying on the now-outdated clinical waiver. *See id.* ¶ 89. That same declaration further told the USCIS that if that clinical waiver was still on the books, Trilleras would like the USCIS to formally cancel it. *Id.* And although Trilleras was not sure whether using a declaration to "cancel" her waiver was proper, she did not know what else she could do—at the time she was processing her application, no "formal mechanism, form, or procedure" to "cancel" a waiver existed. *Id.*

So Trilleras sued, filing this case with her spouse, Liao, on July 6, 2026. ECF 1. Their chief allegation is that the USCIS and the State Department are employing an unwritten "one waiver per customer" rule in violation of the APA. *See id.* ¶ 1. Plaintiffs amended their complaint to add FOIA claims, ECF 3 ¶¶ 140–47, and then on August 24, 2026, moved for a preliminary injunction, ECF 8. The motion for preliminary injunction asks the Court to prevent the September Rule from being applied to Trilleras until the underlying dispute—i.e., whether the "one waiver per customer" rule exists and, if so, whether it is lawful—can be adjudicated. ECF 8 ¶ 1. If the September Rule is not enjoined, Trilleras will begin accruing unlawful presence on September 15, 2026. *Id.* ¶ 4; *see also* ECF 11 at 8–9.

Separately—two weeks before the preliminary injunction motion was filed—the USCIS reopened Trilleras' application to waive the two-year foreign-residence requirement. ECF 12 ¶ 1. On August 31, 2026, the USCIS requested that Trilleras submit fresh evidence supporting her assertions that her family would face exceptional hardship if she was to return to Colombia.[4] *See* ECF 11-2. Trilleras has agreed to engage in this administrative reprocessing and has worked with the USCIS to establish a schedule for her submission of new evidence. *See* ECF 12 ¶¶ 3–5. That administrative activity is still ongoing and is not expected to be resolved by the date the September Rule takes effect. *See id.*

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that they would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tilts in their favor, and (4) that an injunction serves the public interest. *Id*. at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The third and fourth prongs—the balance of equities and the public interest—"merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In APA cases, the Court can grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 or "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing the issuance of a preliminary injunction

[4] When Trilleras submitted her first exceptional hardship waiver application, her evidence of hardship was based mostly on the hardship Liao would suffer with Trilleras' departure. *See* ECF 3 ¶ 89. But between the initial processing of that application and the recent *re*processing of that application, Trilleras and Liao had a child. *Id.* ¶ 95. Any hardship that child would face from its mother's relocation is now relevant to the agency's assessment. *See* ECF 11-2 at 3.

govern the issuance of relief under Section 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020); *see also Make the Road N.Y. v. Mullin*, 179 F.4th 16, 24–25 (D.C. Cir. 2026).

## III. ANALYSIS

The Court's assessment of Plaintiffs' claim for injunctive relief starts and ends with the first preliminary injunction factor: likelihood of success on the merits. Regardless of whether Plaintiffs could ultimately show that Defendants are employing an unwritten "secret law" in violation of the APA, Plaintiffs have not shown that they are likely to succeed in this case, for at least two independent reasons. First, because Defendants have reopened Trilleras' waiver application, and Trilleras has agreed to submit new evidence in support of that application, the Court is not convinced that Plaintiffs have challenged a final agency action, which is a necessary precondition to APA review. *See* 5 U.S.C. § 704; *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 (D.C. Cir. 2012). And second, because Plaintiffs have not shown that the harm Trilleras and her family will allegedly suffer from the September Rule was caused by Defendants' unlawful conduct, or that enjoining application of the September Rule would redress any injury incurred from unlawful conduct, Plaintiffs have not shown that they have the requisite standing to seek the injunctive relief they ask for. *See Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 328 (D.C. Cir. 2004). Because Plaintiffs have not shown likelihood of success, the Court does not consider the other preliminary injunction factors. *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011).

### A. This case is not moot.

Before proceeding to the meat of the analysis, the Court offers a brief word on mootness. Defendants argue that because Trilleras' waiver application has now been reopened, the

controversy Plaintiffs allege in their complaint is dead letter. ECF 11 at 20. While this argument necessarily overlaps with Defendants' final-agency-action arguments—arguments the Court agrees with *infra*—the Court addresses mootness separately because it goes to this Court's jurisdiction. *Compare Am. Whitewater v. Fed. Energy Regul. Comm'n*, 183 F.4th 805, 813 (D.C. Cir. 2026) (federal courts have "an independent duty" under Article III to consider "whether the case is moot"), *with Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) ("The APA's final agency action requirement is not jurisdictional.").

The Court concludes that this controversy is not moot for two reasons.

First: A case only becomes moot "when, by virtue of an intervening event, a court . . . cannot grant any effectual relief what[so]ever in favor of the [plaintiff]." *Calderon v. Moore*, 518 U.S. 149, 150 (1996). That means that if a court is able to grant some modicum of relief—even if the relief is only a "partial remedy" for the plaintiff—that is "sufficient to prevent [the] case from being moot." *Id.*

Here, the chief relief Plaintiffs sought in their complaint was the swift reprocessing of Trilleras' application. ECF 3 at 42–44. That relief has now been effectuated without Court intervention. *See* ECF 12 ¶ 1. However, Plaintiffs *also* sought a declaration that the Defendants' "unwritten rule or practice of categorically refusing to review" waiver applications in situations where the applicant had received "a prior unutilized waiver" is unlawful. ECF 3 at 42–43. Even though the Court is now without authority to order that first and primary form of relief, the Court could still, theoretically, offer that second form of relief, should the Court eventually find in Plaintiffs' favor. And that declaratory relief would affect Plaintiffs' rights going forward, even if only in limited part: It would make it so the USCIS and State Department could not deny Trilleras' new application on the same grounds as before and would instead require the agencies to adjudicate

Trilleras' application on the merits. The fact that this conceivable remedy remains on the table suffices to prevent Plaintiffs' claims from being moot. *See Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 529 (D.C. Cir. 2025) ("A case may be saved from mootness where a declaratory judgment has the potential to impact a concrete interest pending before another decisionmaker.").

Second: The action that threatens to moot the case—the reopening of Trilleras' waiver application—only occurred because of the USCIS's independent action once litigation began. *See* ECF 12 ¶ 1. In such a situation, the voluntary-cessation doctrine applies. *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). That doctrine exists to ensure that a defendant cannot "manipulat[e] the judicial process through the false pretense of singlehandedly ending a dispute." *Id.* And when a defendant does insist that a case is moot because it has voluntarily ceased the unlawful conduct, the defendant must meet a "stringent" and "heavy burden" to convince the court of mootness; indeed, the case remains live unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Defendants do not meet that burden here. While the record contains no strong showing that the Defendants are "manipulating" this Court's jurisdiction, Plaintiffs allege as much. ECF 13 at 5. They may be wrong, but the reopening of Trilleras' application once litigation began creates at least a "plausible argument" that the agency was trying to moot this case. *Pub. Citizen*, 92 F.4th at 1129; *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-5148, 2026 WL 2451517, at *7–8 (D.C. Cir. Aug. 21, 2026) (not applying voluntary cessation when there was "no reason to suppose the government had any awareness of Plaintiffs' lawsuit" before policy change). In view of that, the Court does not find a sufficient basis to determine that it is "absolutely clear"

that the complained-of conduct—denying Trilleras' exceptional hardship waiver application on the basis of her previous clinical waiver—could not recur. The Court is therefore satisfied that it has jurisdiction to address the present motion. *Cf. FBI v. Fikre*, 601 U.S. 234, 242–43 (2024) (case against government not moot even when Supreme Court "accept[ed] as true" the government's assertion that it had no intention to resume complained-of conduct).[5]

**B. There is no final agency action.**

The Court turns now to the substance of the instant motion: whether staying the application of the September Rule against Trilleras is warranted. The Court concludes that it is not.

The first reason for this conclusion is that the Plaintiffs have not challenged a final agency action. Challenging such an action is generally a prerequisite to obtaining review under the APA. *See* 5 U.S.C. § 704 (agency actions are "subject to judicial review" only if they are "final" or are otherwise "made reviewable by statute"). Thus, when a plaintiff challenges only *non*final agency actions, they lose their case right out of the gate. *See Clifton Power Corp. v. Fed. Energy Regul. Comm'n*, 294 F.3d 108, 110 (D.C. Cir. 2002).

To distinguish nonfinal agency actions from final ones, courts use a two-part test. To be "final," an agency's action must first "mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178. If either of those factors is lacking, the agency action is an unreviewable nonfinal one. *See id.* at 177–78.

[5] The Court notes that even if it were to determine that all the claims at issue in this motion were in fact moot, the Court still would not have grounds to dismiss the case in its entirety. *Cf. Cierco v. Mnuchin*, 857 F.3d 407, 414 (D.C. Cir. 2017) ("If a case is moot, the court must dismiss it for lack of jurisdiction."). That is because Plaintiffs' FOIA claims (which are not at issue on this motion) remain live, and the Court has not seen any indication that it lacks subject matter jurisdiction over those causes of action. *See* ECF 3 ¶¶ 140–47.

A textbook example of a nonfinal agency action is an agency adjudication that is actively being processed via an "administrative reconsideration" of a prior decision. *Clifton Power*, 294 F.3d at 110. The fact that such an action would be "nonfinal" makes sense—an adjudication that has not actually been adjudicated cannot "mark the consummation" of a "decisionmaking process." Further, no "rights or obligations" or "legal consequences" can flow from a matter that is still pending. Consequently, when a plaintiff challenges an agency's adjudicatory decision in court while simultaneously petitioning the agency to reconsider that same decision, the plaintiff's lawsuit is "incurably" premature. *Id.* If a plaintiff loses an adjudication, they are empowered to "choose between [a] rehearing before the agency or immediate court review," but they cannot choose both, at least until the agency's reconsideration is complete. *Id.* at 110–11.

Unfortunately for Plaintiffs, they now find themselves in that exact situation: They are seeking this Court's review of a now-vacated adjudication while simultaneously asking the agency to take another stab at the issue. *See* ECF 12 ¶¶ 1–5. The action Plaintiffs challenge is therefore a nonfinal one. Indeed, a judge in this District recently reached an identical conclusion on facts that are quite analogous to the ones here. *See O'Sullivan v. U.S. Dep't of Health & Hum. Servs.*, No. 22-cv-1189, 2024 WL 1071045, at *1 (D.D.C. Mar. 12, 2024) (resubmission of J-1 visa holder's waiver application during litigation was "fatal" to APA claim "as it render[ed]" previous waiver denial "nonfinal").

Plaintiffs would have the Court distinguish *O'Sullivan* (and presumably the *Clifton Power* line of cases) because the *O'Sullivan* plaintiff "voluntarily" sought reconsideration from the agency while litigation was pending, whereas Plaintiffs here "did not request reconsideration." ECF 13 at 7. Instead, Trilleras' application was "unilateral[ly]" reopened, perhaps in part because the agency was "provoked" by being sued. *Id.* Plaintiffs further argue that "if this 'reopening

gambit' were permitted, federal agencies could perpetually insulate their illegal policies from judicial review by simply reopening files whenever they are sued, only to reissue boilerplate denials once the lawsuit is dismissed." *Id.* at 8.

The argument is a fair one, but the Court is not convinced. First, as a factual matter, Plaintiffs have stipulated that they are actively engaging in the agency's reopened case. Indeed, as part of the administrative reprocessing, the USCIS has requested evidence of exceptional hardship from Trilleras and Liao, ECF 11-2 at 3–6, and Trilleras and Liao have indicated that they intend to gather and provide that evidence to the agency to assist in its determination, *see* ECF 12 ¶¶ 3–4. Thus, while the reopening of the case itself might have been "unilateral," the renewed adjudication process seems very much to be a two-sided affair.

And second, from the Court's review of the law, whether an administrative adjudication is reopened on an applicant's motion or on the agency's motion seems generally to be a distinction without a difference. Multiple cases from district and circuit courts across the country have considered situations in which the USCIS has unilaterally reopened visa adjudications during litigation, and by and large those cases have concluded that those reopenings caused plaintiffs to fail the "final agency action" requirement. *See, e.g.*, *6801 Realty Co., LLC v. U.S. Citizenship & Immigr. Servs.*, 719 F. App'x 58, 60 (2d Cir. 2018) ("USCIS's reopening rendered the initial visa denial non-final."); *Bhasin v. U.S. Dep't of Homeland Sec.*, 413 F. App'x 983, 985 (9th Cir. 2011) (same); *Mamigonian v. Biggs*, 710 F.3d 936, 941 (9th Cir. 2013) (same), *abrogated in part by Patel v. Garland*, 596 U.S. 328 (2022); *Amponsah v. Barr*, No. 20-cv-4639, 2020 WL 7327699, at *2 (N.D. Ill. Dec. 11, 2020) (same); *Utah Life Real Est. Grp., LLC v. U.S. Citizenship & Immigr. Servs.*, 259 F. Supp. 3d 1294, 1300 (D. Utah 2017) (same); *Reyes v. Rodriguez*, No. 15-cv-195, 2015 WL 13919460, at *6 (D.S.C. June 4, 2015) (same); *Ahlijah v. Nielsen*, No. 17-cv-1720,

2018 WL 3363875, at *2 (D. Md. July 10, 2018) (same), *aff'd*, 755 F. App'x 290 (4th Cir. 2019) (per curiam); *Net-Inspect, LLC v. U.S. Citizenship & Immigr. Servs.*, No. 14-cv-1514, 2015 WL 880956, at *4–5 (W.D. Wash. Mar. 2, 2015) (same); *True Cap. Mgmt., LLC v. U.S. Dep't of Homeland Sec.*, No. 13-cv-261, 2013 WL 3157904, at *3 (N.D. Cal. June 20, 2013) (same); *Colmenares Calderon v. Bondi*, No. 26-cv-726, 2026 WL 1145816, at *4 (M.D. Fla. Apr. 28, 2026) (same); *German Language Ctr. v. United States*, No. 09-cv-3950, 2010 WL 3824636, at *3 (S.D. Tex. Sept. 27, 2010) (same).[6]

A small handful of district court cases go the other way, but they are readily distinguishable. In *Mantena v. Hazuda*, the Southern District of New York found that the USCIS's reopening of a visa petition did not make the agency's adjudication nonfinal. No. 17-cv-5142, 2018 WL 3745668, at *5–6 (S.D.N.Y. Aug. 7, 2018). But there, the USCIS had clearly engaged in gamesmanship: At the time of the court's decision, the USCIS had already reopened and revoked the visa petition on three separate occasions. *See id.* at *5. Indeed, on the most recent reopening, the agency had not even taken steps to obtain evidence that would be relevant to its new adjudication of the application. *Id.* at *6. The court therefore found that the agency's purported reopening was not a legitimate reopening at all, such that the previous denial of the plaintiff's application remained the agency's final decision. *Id.* The court acknowledged that its case was the rare one, stating that "courts typically hold that re-opened cases are non-final." *Id.*

Likewise, in *RELX, Inc. v. Baran*, a judge in this District held that an agency's reopening of a visa adjudication did not render the previous adjudication nonfinal. 397 F. Supp. 3d 41, 53 (D.D.C. 2019). But the judge reached that conclusion specifically by analogizing to *Mantena*: As in that case, *RELX* concluded that the agency had "reopened the case in name only" to evade APA

[6] *See also Mukhtar v. Lambrecht*, 172 F.4th 836, 842 (10th Cir. 2026) (reaching similar decision on mootness grounds).

review. *Id.* (noting that defendant had "fail[ed] to follow its own regulation related to reopening the case" and "fail[ed] to request any new evidence"); *see also id.* at 50 ("Generally, an agency's decision to reopen a case may render a final agency action nonfinal."). Even those cases, then, support the idea that the USCIS's unilateral reopening of a visa adjudication generally renders the action nonfinal, subject only to an exception for cases with a clear record of agency subterfuge.[7]

The court does not have any clear record of subterfuge here. To the contrary, although the USCIS reopened Trilleras' application after litigation, it did so before the motion for a preliminary injunction was filed. *Compare* ECF 12 ¶ 1, *with* ECF 8. Further, and more importantly, the USCIS promptly sent Trilleras a request for evidence in support of her waiver application, seeking various records that would prove Trilleras' assertions that Liao and her child would suffer an exceptional hardship upon her relocation. ECF 12 ¶ 3; ECF 11-2 at 3–6; *see also 6801 Realty Co.*, 719 F. App'x at 60 ("The reopening was not an informal revision that offered a mere possibility of success; USCIS actually reopened the decision and actively sought new evidence."). True enough, it could be the case that the USCIS is simply going through the motions of reconsideration, when in reality it has already decided to deny Trilleras' application even before it sees the evidence in her favor. *Cf.* ECF 13 at 7–8. But it could also be the case that the agency realized it made a mistake when it denied Trilleras' previous application on grounds that she had not "canceled" her clinical waiver. *Cf. Gibbs v. Brady*, 773 F. Supp. 454, 456–57 (D.D.C. 1991) (after agency was notified it had engaged in "prohibited employment practice," agency took "voluntary corrective action" that "provided plaintiff with the same relief as [a] court-ordered [injunction] would have provided"). The record before the Court does not allow it to determine which of these two possibilities is closer

[7] The Court also notes that both *Mantena* and *RELX* addressed this issue on motions to dismiss, such that the defendant agencies bore the burden of persuasion. *Mantena*, 2018 WL 3745668, at *1; *RELX*, 397 F. Supp. 3d at 44, 53. The opposite is true here.

to the correct one. And at bottom, that lack of evidence does not suffice to award Plaintiffs the "extraordinary remedy" they seek. *Winter*, 555 U.S. at 22.

Because Plaintiffs have not shown that they challenge a final agency action, they are not likely to prevail on the merits and are thus not entitled to preliminary injunctive relief.

**C. Plaintiffs lack standing for the injunctive relief they seek.**

Still, even if Plaintiffs had convinced the Court that they *were* challenging a final agency action, the Court would not be convinced that they have standing to obtain an injunction against the September Rule (which is precisely what this motion seeks). *See* ECF 8 at 1. That provides a separate ground for concluding that Plaintiffs have not satisfied their preliminary injunction requirements, because "the affirmative burden of showing a likelihood of success on the merits necessarily . . . depends on a likelihood that [the] plaintiff has standing." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (per curiam).

To have standing, a plaintiff must show that they "suffered an injury in fact"; that there is a "causal connection between the injury and the conduct complained of"; and that it is "likely" that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And although a plaintiff must show some amount of standing to even get through the doors of a federal courthouse, having standing to file a lawsuit is not the same as having standing to obtain an injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Rather, a plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Plaintiffs here do not have standing to stay the application of the September Rule against Trilleras because they have not adequately shown causation and redressability. Start with causation. To show causation to seek injunctive relief, a plaintiff must show that the threatened

injury "[is] fairly traceable to the challenged action of the defendant." *Id.* Plaintiffs have not made that showing. First, the injury Plaintiffs assert here is Trilleras' accrual of unlawful presence that will begin once the September Rule takes effect. ECF 8 ¶¶ 3–4. That might well be an injury, but it has little to do with the "challenged action" from Plaintiffs' complaint, i.e., the Defendant agencies' alleged secretive use of an unlawful "one waiver per customer" rule. ECF 3 ¶¶ 13, 18, 96. Indeed, whether the Defendants did or did not have this secret rule, that would change nothing about the content of the upcoming regulation change or the date on which it will take effect. The September Rule simply pertains to matters independent of the conduct Plaintiffs challenge. *See generally* Establishing a Fixed Time Period of Admission, 91 Fed. Reg. 44976 (July 17, 2026).

Further, the injury Trilleras faces was caused in the first instance by decisions made by people other than Defendants. Before applying for the exceptional hardship waiver, Trilleras had already secured a clinical waiver, which would, by its terms, suspend the requirement that she return to Colombia for two years. ECF 3 ¶¶ 71–74. Although the receipt of that waiver would not itself prevent her from accruing unlawful presence when the September Rule eventually came along (more on that below), it would at least give Trilleras as much time as she needed to try to transition to an H-1B visa, which *would* prevent her from accruing unlawful presence by shifting her to "immigrant" status. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). But Trilleras chose to forgo that waiver and instead begin a new lengthy agency adjudication whose success was not guaranteed. ECF 3 ¶¶ 74–76. That decision was the first step of the causation chain that led to the present predicament. *Contra* ECF 13 at 19–20. And while it is possible that Trilleras did not fully understand the import of that decision because she received poor legal advice, *see* ECF 3 ¶ 77, that is a third party's alleged shortcoming, not the Defendants'. Plaintiffs have the burden to show "a substantial probability that the challenged acts of the defendant caused their injury." *Util. Workers*

*Union of Am. Loc. 464 v. Fed. Energy Regul. Comm'n*, 896 F.3d 573, 577 (D.C. Cir. 2018). As the record and the pleadings suggest at least some probability that the impending injury was *not* the result of the challenged acts, the Court cannot say that Plaintiffs have met that burden.

Then turn to redressability. To satisfy that factor in the context of a preliminary injunction, a plaintiff must show that it is "likely that a favorable judicial decision will prevent or redress the injury" complained of. *Summers*, 555 U.S. at 493. That showing is also lacking here. Both Plaintiffs and Defendants seemingly agree that even if the Court was to award the Plaintiffs all the relief they seek, that would not stop the unlawful presence clock from ticking when September 15 comes. That is because even if Trilleras received an exceptional hardship waiver, she would still accrue unlawful presence until she accomplished the subsequent step of applying to transition from nonimmigrant to immigrant status. *Compare* ECF 11 at 34 (citing 8 U.S.C. § 1182(e)), *with* ECF 13 at 19 (acknowledging that if Trilleras received an exceptional hardship waiver, she would then seek to "appl[y] for adjustment or an H-1B visa [stamp]"). There is no guarantee that Trilleras would be able to accomplish that step. *See* ECF 11 at 34; ECF 13 at 19. Even if the Plaintiffs were to succeed on every cause of action they bring, then, the Court could still not say that it is "likely" that Trilleras' unlawful-presence-accrual injury will be prevented. *Summers*, 555 U.S. at 493.

To be sure, if the Court simply enjoined application of the September Rule to Trilleras full stop without examining the relationship between the rule and Plaintiffs' allegations, that would keep Trilleras from being injured. Plaintiffs flirt with making such a request in their briefing. *See* ECF 13 at 18 (seeking relief under APA § 705). But the Court has no basis to issue such a freewheeling injunction because, again, Plaintiffs bring no independent challenge to the September Rule. To the contrary, they state explicitly that they have no legal quarrel with it. *See id.* at 18–19. In fact, Plaintiffs' complaint contains almost no mention of the September Rule whatsoever, aside

from a cursory reference to it in a footnote. *See* ECF 3 ¶ 11 n.1. An injunction against the September Rule is certainly not mentioned in the prayer for relief. *See generally id.* at 42–44. Under such circumstances—with the requested relief being unmoored from specific allegations of wrongdoing—an injunction cannot issue. *See Aminjavaheri v. Biden*, No. 21-cv-2246, 2021 WL 4399690, at *5 (D.D.C. Sept. 27, 2021) ("A plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint."). And although Plaintiffs point (belatedly, in their reply brief) to § 705 of the APA, which allows a court to "postpone the effective date of an agency action" or otherwise "preserve status or rights pending conclusion of the review proceedings," that provision gets them no further, because "requests for relief under 5 U.S.C. § 705 are evaluated under the same standards as requests for preliminary injunctions." *Coal. for Indep. Tech. Rsch. v. Rubio*, No. 26-cv-815, 2026 WL 2030770, at *5 (D.D.C. July 14, 2026). Thus, Plaintiffs' failure to show likelihood of success on the merits applies with equal force to an APA stay.

Because the Plaintiffs have, at a minimum, failed to show that the harm from the impending rule change was likely caused by the complained-of conduct, or that the harm is likely redressable by any decision this Court could issue, Plaintiffs have not shown that they have standing to receive the preliminary injunction they request.

* * *

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction, ECF 8, is **DENIED**. A separate order follows this opinion.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: September 14, 2026